Marvin R. BROADBENT et al., Appellants,

v.

ORGANIZATION OF AMERICAN STATES et al., Appellees.

No. 78–1465.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1979.

Decided Jan. 8, 1980.

Thomas J. O'Toole, Boston, Mass., a member of the bar of the Supreme Court of Massachusetts, pro hac vice, by special leave of the court, with whom Francis X. McLaughlin, Kensington, Md., was on brief, for appellant.

George H. Clark, Washington, D. C., with whom Gordon H. Glenn, Washington, D. C., on brief, for appellees.

Andrew N. Vorkink, Counsel, World Bank, New York City, with whom J. I. Levinson, Gen. Counsel, Washington, D. C. and Walter F. Sheble, Counsel, Inter-American Development Bank, Washington, D. C., were on brief, for amicus curiae, urging affirmance.

Alice E. Weil, with whom Paul C. Szasz, New York City, was on brief, for amicus curiae, United Nations, urging affirmance.

William D. Rogers and Edward J. Spriggs, Washington, D. C., were on brief for amicus curiae, Intern. Telecommunications Satellite Organization urging affirmance.

Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty.*, Ronald R. Glancz, Bruno A. Ristau and David P. Buck, Attys., Office of Foreign Litigation, Dept. of Justice, Washington, D. C., were on brief, for amicus curiae, United States, urging affirmance.

Before LEVENTHAL **, and WALD, Circuit Judges; and PENN ***, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

* United States Attorney at the time the brief was filed.

** Judge Leventhal authored this opinion but died before it was released.

*** Sitting by designation pursuant to 28 U.S.C. § 292(a).

LEVENTHAL, Circuit Judge:

This is an appeal from a District Court judgment dismissing an action by the appellants[1] claiming they had been improperly discharged by the *Organization of American States* (OAS). The district court held that OAS was absolutely immune from suit.[2] We affirm on the ground that, even assuming for discussion the applicability of the lesser, "restrictive" immunity doctrine, which permits a lawsuit based on "commercial" activity to be maintained against a sovereign without its consent, this case does not present such "commercial" activity.

## I. BACKGROUND

The plaintiffs-appellants are seven former staff members of the General Secretariat of OAS. Before their termination, they had been employed at the permanent headquarters of the organization in Washington, D. C., for periods ranging from six to twenty-four years. They are all United States citizens or foreign nationals admitted to permanent residency in the United States.

The appellants were dismissed from the Secretariat on August 31, 1976, due to a reduction in force mandated by the OAS General Assembly. At various times between October 31 and November 8, 1976, they filed complaints with the Administrative Tribunal of the OAS, the internal court created to resolve personnel disputes. On June 1, 1977, the Tribunal held that the discharges had been improper and that the appellants should be reinstated at the grades they held when they were separated from service. In accordance with its governing statute, the Tribunal also fixed an indemnity to be paid to each appellant should the Secretary General choose to exercise the option of refusing to reinstate them. Subsequently, the Secretary General

1. *Amici Curiae* briefs were submitted by the International Bank for Reconstruction and Development and the Inter-American Development Bank, the International Telecommunications Satellite Organization, the United Nations, and the United States.

2. Joint Appendix (J.A.) at 48–50.

denied reinstatement, and each appellant received the indicated indemnity.[3]

On November 16, 1977, the appellants brought this action in the district court, alleging breach of contract and seeking damages totalling three million dollars. The OAS moved to quash service and dismiss the complaint, asserting that the district court lacked subject matter jurisdiction and that the OAS is immune from service of process; but the district court denied the motion in an order dated January 25, 1978.[4] On February 28, the OAS filed a request for certification under 28 U.S.C. § 1292(b) so as to take an interlocutory appeal of the January order to this court. In a final order dated March 28, 1978, the district court vacated its order of January 25 and dismissed the lawsuit.[5] The March 28 order stated in pertinent part:

On January 25, 1978, this Court held that the express language of 22 U.S.C. § 288a(b) and the statutory purposes underlying the International Organizations Immunities Act of 1945 bring international organizations within the terms of the Foreign Sovereign Immunities Act of 1976, and that pursuant to 28 U.S.C. § 1330 this Court had jurisdiction over the parties and controversy involved in the case. Upon careful review of that decision, the Court finds that it did not properly weight the facts that international organizations, and particularly the Organization of American States, are creatures of treaty and by virtue of treaty stand in a different position with respect to the issue of immunity than sovereign nations. The Court is persuaded that international organizations are immune from every form of legal process except insofar as that immunity is expressly waived by treaty or expressly limited by statute. The Court is further persuaded that this Court has jurisdiction over lawsuits involving international organizations only insofar as such jurisdiction is expressly provided for by statute.

The Foreign Sovereign Immunities Act of 1976 makes no mention of international organizations. The jurisdictional grant of 28 U.S.C. § 1330 refers only to foreign states. Nothing in the International Organizations Immunities Act of 1945 provides for jurisdiction in the district courts over civil actions against international organizations.

On April 19, 1978, appellants filed their notice of appeal from this ruling.

## II. ANALYSIS

### A. *Jurisdiction*

In its final order, the district court concluded that it lacked subject matter jurisdiction,[6] and the OAS advances that position on appeal. Appellants—and the district court in its January 25 order—rely upon a conjunctive reading of the International Organizations Immunity Act (IOIA) of 1945, 22 U.S.C. § 288a(b)[7] (1979), and the

---

3.  The amounts of the indemnities ranged from $9,000 to $12,000 plus attorney's fees.

4.  J.A. 26–27.

5.  J.A. 48–51.

6.  J.A. at 50.

7.  22 U.S.C. § 288a provides:
    International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:
    (a) International organizations shall, to the extent consistent with the instrument creating them, possess the capacity—
        (i) to contract;
        (ii) to acquire and dispose of real and personal property;
        (iii) to institute legal proceedings.

(b) International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.
(c) Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be expressly waived, and from confiscation. The archives of international organizations shall be inviolable.
(d) Insofar as concerns customs duties and internal-revenue taxes imposed upon or by reason of importation, and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communi-

Foreign Sovereign Immunities Act (FSIA) of 1976, 28 U.S.C. § 1330 (1979),[8] to establish jurisdiction. The OAS counters that § 288a(b) confers immunity, not jurisdiction, and that § 1330 establishes jurisdiction over suits against foreign *states*, not international organizations.

The United Nations (U.N.), appearing *amicus curiae*, offers a different approach to the question of jurisdiction. It contends that jurisdiction over suits involving international organizations exists under 28 U.S.C. § 1331(a).[9] In support of this contention, *amicus* cited *International Refugee Organization v. Republic Steamship Co.*, 189 F.2d 858, 861 (4th Cir. 1951), which held that "an international organization created by treaties to which the United States is a party may invoke [federal question] jurisdiction because it is created by a treaty of the United States." That case also found an alternate basis for federal court jurisdiction over suits brought by international organizations in the provisions of 28 U.S.C. § 288a(a) that confer capacity to sue upon international organizations. *Id.* at 860. Counsel for the U.N. reasons from this alternative holding that, if international organizations may institute suits in a federal

court, they should be permitted to defend them there; thus, he argues that § 1331 should be construed to confer federal jurisdiction over such suits.

Because clear and adequate non-judicial grounds for the disposal of this case exist, we need not and do not decide the difficult jurisdictional issues it presents.

### B. *The Immunity of International Organizations*

The International Organizations Immunities Act of 1945, 22 U.S.C. § 288a(b) (1979), grants to international organizations which are designated by the President [10] "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." [11] As of 1945, the statute granted absolute immunity to international organizations, for that was the immunity then enjoyed by foreign governments.

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* (1979), codified what, in the period between 1946 and

cations, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

**8.** 28 U.S.C. § 1330 provides:

*Actions against foreign states.*

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

**9.** *28 U.S.C. § 1331(a)* provides:

*Federal question; amount in controversy costs.*

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

**10.** By Executive Order 10533 (June 3, 1954), 19 Fed.Reg. 3289 (1954), President Eisenhower designated the OAS an international organization entitled to the privileges and immunities conferred by the IOIA.

**11.** The legislative history of the Act makes clear the Act was passed to fill a then existing void in our domestic law with respect to the legal status of international organizations. H.Rep. No. 1203, 79th Cong., 1st Sess. 2 (1945), U.S.Code Cong. Serv. 1945, p. 946.

1976,[12] had come to be the immunity enjoyed by sovereign states—*restrictive* immunity. The central feature of restrictive immunity is the distinction between the governmental or sovereign activities of a state (acts *jure imperii*) and its commercial activities (acts *jure gestionis*). Foreign states may not be found liable for their governmental activities by American courts; but they enjoy no immunity from liability for their commercial activities.

*Contention for restrictive immunity*

Appellants—and the United States as *amicus curiae*—submit the following syllogism: the IOIA conferred on international organizations the same immunity enjoyed by foreign governments; the FSIA indicates that foreign governments now enjoy only restrictive immunity; therefore, international organizations enjoy only restrictive immunity. They are supported by the general doctrine that ordinarily, "[a] statute which refers to the law of a subject generally adopts the law on the subject as of the time the law was invoked . . . includ[ing] all the amendments and modifica-

tions of the law subsequent to the time the reference statute was enacted." [13]

*Contention for absolute immunity*

The OAS and several other international organizations as *amici curiae* counter that Congress granted international organizations absolute immunity in the IOIA, and it has never modified that grant. They rely on three implications of a legislative intent *not* to apply to international organizations the post World War II evolutions in the doctrine of sovereign immunity.

First, the FSIA is generally silent about international organizations. No reference to such organizations is made in the elaborate definition of "state" in § 1603,[14] and only § 1611 [15] even alludes to their existence. True, § 1611, dealing as it does with the attachment of property belonging to international organizations, presupposes a successful action against an international organization. However, that could follow a waiver of immunity. Alternatively, § 1611 would have application in case of an attempt to execute a judgment against a foreign state by attaching funds of that for-

12. *See, e. g.,* The "Tate Letter," 26 Dept. State Bull. 984–85 (1952), quoted in *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1975).

13. Sands (ed.), Sutherland Statutory Construction § 51.08 (4th ed. 1975).

14. 28 U.S.C. § 1603 (1979) provides:
§ 1603. Definitions
For purposes of this chapter—
(a) A "foreign state" except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
(b) An "agency or instrumentality of a foreign state" means any entity—
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned·by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.
(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

15. 28 U.S.C. § 1611 (1979) provides in pertinent part:
. . . . the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the states.

eign state held by an international organization.[16]

Second, by its own terms the IOIA provides for the modification, where appropriate, of the immunity enjoyed by one or more international organizations.

Under the statute, the President can withdraw or restrict the immunity and privileges thereby conferred. Specifically, it provides:

> The president (is) authorized, in the light of the functions performed by any such international organization, by appropriate executive order to withhold or withdraw from any such organization or its officers or employees any of the privileges, exemptions, and immunities provided for in this title  . . .  or to condition or limit the enjoyment by any such organization or its officers or employees of any such privilege, exemption, or immunity.[17]

The Senate Report on the IOIA stated: "This provision will permit the adjustment or limitation of the privileges in the event that any international organization should engage for example, in activities of a commercial nature."[18] And, in floor debate on the legislation, its supporters pointed again to this provision as a limitation on commercial abuses by an international organization.[19] Hence this provision may reveal that Congress intended to grant absolute immunity to international organizations giving to the President the authority to relax that immunity, including removal or restriction of immunity in cases involving the commercial activities of international organizations.

Finally, Congress may have concluded that the policies and considerations that led to the development of the restrictive immunity concept for foreign nations do not apply to international organizations like the OAS.[20]

We need not decide this difficult question of statutory construction. On *either* theory of immunity—absolute or restrictive—an

---

**16.** According to the House Report:

> The purpose of this section is to permit international organizations designated by the President pursuant to the International Organization Immunities Act, 22 U.S.C. 288 *et seq.*, to carry out their functions from their offices located in the United States without hindrance by private claimants seeking to attach the payment of funds to a foreign state; such attachments would also violate the immunities accorded to such international institutions.

H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 30 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6629. The Report continues, even more pointedly

> This reference to "international organizations" in this subsection is not intended to restrict any immunity accorded to such international organizations under any law or international agreement.

*Id.* at 31, U.S.Code Cong. & Admin.News 1976, at 6630.

**17.** 22 U.S.C. § 288 (1979).

**18.** S.R.Rep. No. 861, 79th Cong., 1st Sess. 2 (1945).

**19.** *See* 91 *Cong.Rec.* 12,432 (daily ed. Dec. 20, 1945) and 12,530 (daily ed. Dec. 21, 1945).

**20.** Prior to its modification, the absolute immunity of states was justified by "the desirability of avoiding adjudication which might affront a foreign nation and thus embarrass the executive branch in its conduct of foreign relations." *See* Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations, House Committee on the Judiciary, 94th Cong., 2d Sess. 29 (1976). As sovereign nations become more and more involved in the market place, as merchants rather than sovereigns, claims arising out of commercial transactions do not affront the sovereignty of the nations involved. *Id.* Recognition of this growing involvement in commercial activity was the basis of the movement to a restrictive concept. Moreover, most other commercial nations embrace restrictive immunity with regard to sovereigns. Thus, when our government and its instrumentalities are sued abroad in commercial litigation, the sovereign immunity defense is rarely available. H.R. Rep. No. 94–2487, 94th Cong., 2d Sess. 9 (1976). Congressional proponents of the restrictive immunity could thus indicate that use of the restrictive immunity concept would bring the United States into step with foreign nations. *Id.* at 54. But neither rationale for adopting the restrictive notion of immunity would seem to apply to international organizations. Such organizations do not regularly engage in commercial activities, nor do other nations apply the concept of restrictive immunity to them. *Cf. Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 699 702, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1975).

immunity exists sufficient to shield the organization from lawsuit on the basis of acts involved here.

### C. *The "Commercial" Activity Concept in the Restrictive Immunity Doctrine*

Even under the restrictive immunity doctrine, there is immunity from lawsuits based on governmental or sovereign activities—the *jure imperii*—as distinct from commercial activities. We discuss the narrower standard of restrictive immunity not because it is necessarily the governing principle, but because we discern that an organization conducting the activities at issue in this case is shielded even under the restrictive immunity formula, and a *fortiori* on the absolute immunity theory.

Section 1605 of the FSIA provides that foreign states shall not be immune from the jurisdiction of American courts in any case based upon their commercial activity in the United States, with the commercial charac-ter of an activity determined by reference to its "nature" rather than to its "purpose." [21] The conceptual difficulties involved in differentiating *jure questionis* from *jure imperii* have led some commentators to declare the distinction unworkable.[22] The restrictive immunity doctrine is designed to accommodate the legal interests of citizens doing business with foreign governments on the one hand, with the interests of foreign states in avoiding the embarrassment of defending the propriety of political acts before a foreign court.

In our view, the employment by a foreign state or international organization of internal administrative personnel—civil servants—is not properly characterized as "doing business." That view is supported by the legislative history of the FSIA, and the definition of "commercial activity" in § 1603. The House Report commented:

(d) *Commercial activity.*—Paragraph (c) of section 1603 defines the term "commercial activity" as including a broad

---

**21.** 28 U.S.C. § 1605(a) (1979) provides:

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; or

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation deceit, or interference with contract rights.

28 U.S.C. § 1603(d) (1979) defines "commercial activity":

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather then by reference to its purpose.

**22.** *See, e. g.,* Comment, *The Jurisdictional Immunity of Foreign Sovereigns,* 63 Yale L.J. 1148, 1161–62 (1954); Lauterpacht, *The Problem of Jurisdictional Immunities of Foreign States,* 28 Brit.Y.B. Int'l L. 220, 225–26 (1951).

spectrum of endeavor, from an individual commercial transaction or act to a regular course of commercial conduct. A "regular course of commercial conduct" includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation. Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign governmental to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity. By the same token, a foreign state's activities in and "contacts" with the United States resulting from or necessitated by participation in such a program would not in themselves constitute a sufficient commercial nexus with the United States so as to give rise to jurisdiction (see sec. 1330) or to assets which could be subjected to attachment or execution with respect to unrelated commercial transactions (see sec. 1610(b)). However, a transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an AID program. *Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel*, but not the employment of American citizens or third country nationals by the foreign state in the United States.[23]

This report clearly marks employment of civil servants as noncommercial for purposes of restrictive immunity. The Committee Reports establish an exception from the general rule in the case of employment of American citizens or third country nationals by foreign states. The exception leaves foreign states free to conduct "governmental" matters through their own citizens. A comparable exception is not applicable to international organizations, because their civil servants are inevitably drawn from either American citizens or "third" country nations. In the case of international organizations, such an exception would swallow up the rule of immunity for civil service employment disputes.

The United States has accepted without qualification the principles that international organizations must be free to perform their functions and that no member state may take action to hinder the organization.[24] The unique nature of the *international* civil service is relevant. International officials should be as free as possible, within the mandate granted by the member states, to perform their duties free from the peculiarities of national politics. The OAS charter, for example, imposes constraints on the organization's employment practices.[25]

**23.** H.Rep. No. 94–1487, 94th Cong., 2d Sess. 16 (1976) (emphasis added), U.S.Code Cong. & Admin.News 1976, p. 6614.

**24.** *See e. g.* XIII Documents of the United Nations Conference on International Organizations 704–05 (1945), *reprinted in* 13 Whitman, Digest of International Law 36 (1968).

**25.** See *e. g.* OAS Charter, Article 143 (forbidding discrimination on the basis of "race, creed or sex"), Article 126 (requiring staff recruitment on as wide a geographic basis as possible).

Such constraints may not coincide with the employment policies pursued by its various member states.[26] It would seem singularly inappropriate for the international organization to bind itself to the employment law of any particular member, and we have no reason to think that either the President or Congress intended this result. An attempt by the courts of one nation to adjudicate the personnel claims of international civil servants would entangle those courts in the internal administration of those organizations. Denial of immunity opens the door to divided decisions of the courts of different member states passing judgment on the rules, regulations, and decisions of the international bodies. Undercutting uniformity in the application of staff rules or regulations would undermine the ability of the organization to function effectively.[27]

■ We hold that the relationship of an international organization with its internal administrative staff is noncommercial, and, absent waiver, activities defining or arising out of that relationship may not be the basis of an action against the organization—regardless of whether international organizations enjoy absolute or restrictive immunity.

## D. The Activities at Issue Here

■ The appellants were staff members of the General Secretariat of the OAS. Their appointments, terms of employment, salaries and allowances, and the termination of employment were governed by detailed "Staff Rules of the General Secretariat" promulgated by the OAS. The Staff Rules further establish an elaborate grievance procedure within the OAS, with ultimate appeal to the Administrative Tribunal of the OAS.

The Tribunal is competent to determine the lawfulness of an employee's termination of employment. If an employee has been wrongfully discharged, the Tribunal may order reinstatement. If reinstatement is ordered, the Tribunal may also establish an indemnity to be paid to the employee in the

26. For example, the Age Discrimination in Employment Act of 1978, (ADEA) 29 U.S.C. § 621 et seq., forbids in most circumstances a requirement that a person retire at a particular age. Yet other countries consider early retirement an important social goal, the achievement of which facilities advancement by younger people. Since there is no inconsistent provision in the OAS Charter (and since, even if there were the ADEA was enacted after the latest amendment to the OAS Charter), the ADEA presumably would govern, and unless its provisions were construed not to cover international employment, see 29 U.S.C. §§ 630 and 633a, the OAS and other international organizations who are thought not immune from suit would be required to abide by the terms of the Act in their employment here.

Or for another example, the rigid quotas employed as an integral part of recruiting a "balanced" international civil service, see, e. g., General Assembly resolution 33/143, December 18, 1978, might run afoul of the emerging law of "affirmative action" in the United States.

27. Treatise writers on the law of international organizations have recognized the force of the argument made in text. See, e. g., M. B. Akehurst, The Law Governing Employment in International Organizations 12 (1967), which discusses suits such as the instant case in the following terms:

At first sight, disputes of this sort could be referred to municipal tribunals. The organization normally possesses immunity, but immunity can be waived. However, the special nature of the law governing employment in international organizations, closely linked as it is with delicate questions of administrative policy, makes municipal tribunals totally unsuited to deal with it. It would be like an English court trying to judge a dispute between the French Government and one of its officials. Courts in all countries usually refuse to handle questions of foreign public law, and, in the same way, a number of municipal courts have held themselves incompetent to judge claims brought by international civil servants against the organizations which employ them, not on the grounds of immunity, but on the grounds of the special law applicable.

There is therefore a vacuum which needs to be filled by the organizations themselves. The creation of an independent body, empowered to make binding decisions in legal disputes between an organization and its staff, is by no means an altruistic gesture from the organization's point of view; without it, officials might suffer from a sense of injustice which would impair the smooth running of the Secretariat.

The court notes that the OAS, like most international organizations, has established elaborate internal grievance machinery.

event the Secretary General exercises his authority to indemnify the employee rather than effect the reinstatement.

The employment disputes between the appellants and OAS were disputes concerning the internal administrative staff of the Organization. The internal administration of the OAS is a non-commercial activity shielded by the doctrine of immunity. There was no waiver, and accordingly the appellant's action had to be dismissed.

*Affirmed.*