United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 8, 1998 Decided October 9, 1998 

 No. 97-7181

 Janet E. Atkinson,

 Appellant

 v.

 The Inter-American Development Bank, et al., 

 Appellees

 Appeal from the United States District Court

 for the District of Columbia

 (97cv00239)

 Janet E. Atkinson, appearing pro se, argued the cause and 
filed the briefs.

 William D. Rogers argued the cause for appellee The 
Inter-American Development Bank.* On the brief were 
Alexander E. Bennett and Nancy L. Perkins.

 Before: Edwards, Chief Judge, Silberman and Randolph, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: This case involves a well-known 
method of enforcing a judgment and a little-known immunity 
from judicial process. Appellant, in an effort to enforce two 
state court judgments against her former husband by gar-
nishing his wages, sought a declaratory judgment in the 
district court that her husband's employer, a financial institu-
tion protected by the International Organizations Immunities 
Act, is not immune from garnishment proceedings under that 
Act. The district court, concluding that the employer was 
entitled to immunity under the Act, dismissed the declaratory 
judgment action. We affirm.

 I.
 In 1993, a Maryland state court granted appellant Janet E. 
Atkinson a divorce from her husband, Robert J. Kestell. As 
part of the judgment of divorce, appellant was awarded 
alimony of $1,350 per month for four years; child support of 
$2,850 per month; $20,000 in attorney's fees; profits from 
rental property in the amount of $1,221.91; and a monetary 
award of $111,475.00 to compensate her for her interest in 
marital property controlled by her husband. In 1996, the 
state court found Kestell in contempt of court for failure to 
pay alimony and child support during part of 1995, deter-
mined that his accrued arrearages totaled $12,600, and en-
tered judgment for that amount.

 Appellant's attempt to enforce these judgments gave rise to 
the instant litigation.1 Kestell moved to Jamaica, taking with 
__________
 * Robert J. Kestell was named as a defendant in appellant's 
complaint in the district court, but did not appear at any stage in 
the district court action or before us.

 1 Kestell filed for Chapter 7 bankruptcy in Maryland shortly after 
the 1995 divorce decree. Appellant was the largest unsecured 

him all of his assets except one: the future wages that would 
be owed to him by his employer, appellee Inter-American 
Development Bank, an international financial institution head-
quartered in Washington, D.C. At Kestell's request and from 
salary due him, the Bank has paid appellant a total of $4,700 
per month--the $1,350 per month alimony and $2,850 per 
month child support plus $500 per month toward his past 
arrearages.2 But Kestell's cooperation goes only so far. He 
has steadfastly refused to pay appellant the remainder of her 
Maryland judgments, either from his Bank salary or otherwise. 
Accordingly, appellant sought to augment Kestell's voluntary 
monthly payments by garnishing the remainder of his salary.

 Were Kestell's employer a run-of-the-mine private firm 
located in the District of Columbia, a garnishment proceeding 
would pose few difficulties; appellant would bring her Mary-
land judgments to D.C. Superior Court and proceed against 
the garnishee (i.e., the employer) under the statutory scheme 
found in D.C. Code ss 16-501 et seq. But the Bank is not a 
run-of-the-mine firm; rather, it is an institution that has been 
designated by executive order for protection as an interna-
tional organization under the International Organizations Im-
munities Act (IOIA), Ch. 652, Title I, 59 Stat. 669 (1945) 
(codified as amended at 22 U.S.C. ss 288 et seq. (1994)). See 
Exec. Order No. 10,873, 25 Fed. Reg. 3,097 (1960); Exec. 
Order No. 11,019, 27 Fed. Reg. 4,145 (1962). The IOIA 
entitles designated entities to "enjoy the same immunity from 
suit and every form of judicial process as is enjoyed by 
foreign governments, except to the extent that such organiza-
tions may expressly waive their immunity for the purpose of 
any proceedings or by the terms of any contract." 22 U.S.C. 

__________
creditor in that bankruptcy case. Kestell's bankruptcy petition was 
ultimately dismissed under 11 U.S.C. ss 707(b) and 105(a) because 
"the sole purpose of the filing was to avoid the payment of the sums 
owing to his ex-wife on account of the state court judgment." In re 
Kestell, 99 F.3d 146, 150 (4th Cir. 1996).

 2 As a result of the instant litigation, Kestell has agreed to have 
the Bank pay appellant an additional $1,710 per month from his 
salary.


s 288a(b). And a provision of the Inter-American Develop-
ment Bank Act grants the Bank the right to remove any 
action brought against it from state court into federal court. 
22 U.S.C. s 283f.

 This latter obstacle--the likely inability to proceed in state 
court--would not of itself hinder appellant's garnishment 
proceeding, as a federal court can adjudicate garnishment 
proceedings by applying the local statutory scheme. See Fed. 
R. Civ. P. 69(a). Recognizing the more substantial hurdle of 
the Bank's immunity under the IOIA, appellant brought this 
declaratory judgment action in the district court to establish 
that the Bank had waived its immunity, and in the alternative 
that the Bank's immunity even absent waiver does not pre-
clude a garnishment proceeding to enforce a divorce-related 
judgment incurred by an employee of a designated interna-
tional organization such as the Bank. The Bank moved to 
dismiss the action, invoking its status as a protected organiza-
tion under the IOIA and arguing that it had not waived its 
immunity with respect to this type of proceeding. Reviewing 
several cases in which we interpreted the extent to which the 
articles of agreement of the Bank and similar international 
organizations constitute a waiver of immunity, the district 
court granted the Bank's motion.

 II.

 We begin, as the district court implicitly did, by assuming 
arguendo that appellee is entitled to absolute immunity under 
the IOIA and addressing appellant's contention that appellee 
has waived its immunity with respect to a proceeding to 
garnish one of its employee's wages.3 Specifically, appellant 
points to the following provision in the Bank's articles of 
agreement:

 Actions may be brought against the Bank only in a court 
 of competent jurisdiction in the territories of a member 
 in which the Bank has an office, has appointed an agent 

__________
 3 Our assumption here is just that--an assumption. We take up 
the scope of immunity under the IOIA in Part III.

 for the purpose of accepting service or notice of process, 
 or has issued or guaranteed securities.

Agreement Establishing The Inter-American Development 
Bank, Apr. 8, 1959, Art. XI, Section 3, 10 U.S.T. 3068, 3095. 
In Lutcher S.A. Celulose e Papel v. Inter-American Develop-
ment Bank, 382 F.2d 454, 457 (D.C. Cir. 1967), we construed 
this provision as not merely a "venue provision for actions 
resulting from individual waivers; rather it is a provision 
waiving immunity and laying venue for the suits permitted."

 The parties disagree on whether this waiver is broad 
enough to encompass a garnishment proceeding such as the 
one appellant hopes to bring. While the provision might be 
read to establish a blanket waiver of immunity from every 
type of suit not expressly prohibited elsewhere in the articles 
of agreement (only suits by members are expressly prohibit-
ed), we rejected that reading in Mendaro v. World Bank, 717 
F.2d 610, 614-15 (D.C. Cir. 1983) (citing Lutcher, 382 F.2d at 
456) (interpreting identical language in the agreement estab-
lishing the World Bank). Instead, we adopted a test for 
determining when, in the context of a particular suit against 
the Bank, Section 3 should be construed as a waiver of 
immunity: "Since the purpose of the immunities accorded 
international organizations is to enable the organizations to 
fulfill their functions, applying the same rationale in reverse, 
it is likely that most organizations would be unwilling to 
relinquish their immunity without receiving a corresponding 
benefit which would further the organization's goals." Id. at 
617.4

 We then applied this test to hold that the World Bank had 
not waived its immunity from a Title VII sexual harassment 
suit by an employee. See id. at 618-19. We observed that 

__________
 4 The agreement states that "[t]he purpose of the Bank shall be 
to contribute to the acceleration of the process of economic develop-
ment of the member countries, individually and collectively." Arti-
cle I, s 1, 10 U.S.T. at 3072. The Bank's functions include promot-
ing the investment of public and private capital for development 
purposes; utilizing its own capital and other funds raised by it; 
encouraging private investment; assisting member countries in 
efficient use of their resources; and providing technical assistance 
for the implementation of development plans and projects. Id. s 2.

such a waiver would expose the Bank to disruptive interfer-
ence with its employment practices by requiring the Bank to 
adopt the local employment policies of each of its member 
countries, which would imply devastating administrative 
costs. Nor would those costs be justified by the benefit of 
attracting highly qualified staff members, in light of the 
Bank's already established administrative tribunal to resolve 
employees' contract grievances. We contrasted employee 
suits with suits based on commercial transactions with the 
outside world, where the benefits of a waiver would outweigh 
the costs: "If this immunity were not waived[,] the Bank 
would be unable to purchase office equipment or supplies on 
anything other than a cash basis.... Such a restriction 
would unreasonably hobble its ability to perform the ordinary 
activities of a financial institution operating in the commercial 
marketplace." Id. at 618; see also id. at 620 (explaining 
Lutcher's holding that the Bank had waived suits by borrow-
ers on the ground that such waiver "would directly aid the 
Bank in attracting responsible borrowers").

 Appellant seeks to slip around the Mendaro test by assert-
ing that "[a] wage garnishment action ... does not threaten 
the bank's ability to fulfill its purpose and the functions with 
which it was entrusted." In her view, the Bank's immunity 
should be construed as waived unless the particular type of 
suit would impair the Bank's objectives; appellant contends 
that compliance with a garnishment order is a "simple, cleri-
cal operation" that would not cause such impairment. We 
think, however, that our formulation of the Mendaro test 
supports the opposite default rule: the Bank's immunity 
should be construed as not waived unless the particular type 
of suit would further the Bank's objectives. In Mendaro, we 
deemed the benefit of attracting talented employees by virtue 
of permitting suits by employees to be minimal given that 
employees already could invoke an internal grievance mecha-
nism. Here, waiver of immunity from garnishment proceed-
ings, unlike waiver of immunity from employee suits, provides 
no conceivable benefit in attracting talented employees; in 
fact, garnishment of an employee's wages makes the (pro-


spective) employee worse off, not better off. This clear lack 
of benefit--indeed, disadvantage--of a waiver of immunity 
from garnishment proceedings compels the conclusion that 
Section 3 of the agreement should not be construed to waive 
the Bank's immunity in this case.

 Moreover, although we need not consider the costs side of 
the balance, we are skeptical of appellant's view that the costs 
imposed on a garnishee are minimal. In the analogous 
context of attempts to garnish the wages of federal employ-
ees, the Supreme Court long ago observed that the expense 
of defending such garnishment proceedings and complying 
with garnishment orders "might be fatal to the public ser-
vice," Buchanan v. Alexander, 45 U.S. (4 How.) 20, 20 (1846), 
a concern that has been echoed more recently, see Stena 
Rederi AB v. Comision de Contratos, 923 F.2d 380, 392 (5th 
Cir. 1991) (observing that if garnishment were allowed 
"against foreign governmental agencies with operations in the 
United States to prosecute claims against third parties, the 
agencies would be required repeatedly to appear in court to 
protect their own relations with the third parties"); 30 Am. 
Jur. 2d Executions and Enforcement of Judgments s 646 
(1994) (footnotes omitted) ("Garnishment statutes often exhib-
it concern for the protection of both the garnishee and other 
claimants who may be affected by the litigation, since a 
stranger to the proceedings in which a judgment has been 
obtained is an innocent third party who may be exposed to 
the inconvenience, hazards, or expense of extended litiga-
tion.").

 III.

 There remains the question whether the Bank as a matter 
of statute enjoys immunity from garnishment proceedings. If 
the answer is no, then it does not matter whether it can be 
said that the Bank did not "waive" that immunity. The 
district court thought it unnecessary to reach this issue, see 
Mem. Op. (July 11, 1997) at 5 n.4 ("Because this case turns on 
the extent to which the language of the Bank's Articles of 
Agreement waives the Bank's immunity, it is not necessary to 
consider whether the Bank would, in the absence of waiver, 

enjoy absolute immunity under the IOIA, or the more re-
stricted immunity for noncommercial activities contemplated 
by the Foreign Sovereign Immunities Act...."), undoubtedly 
because of our similar statement in Mendaro, 717 F.2d at 618 
n.54. We overlooked, however, that only if we concluded that 
the Bank had waived its immunity would we avoid the need to 
consider the scope of the Bank's immunity ab initio.

 Appellant's first claim is that the IOIA does not contem-
plate immunity from garnishment proceedings. She argues 
there is a de minimis exception to the immunity granted by 
the IOIA, and that garnishment proceedings fall within that 
exception because the burden of being a garnishee is minimal. 
Yet even assuming the burden were minimal, a point on which 
we expressed doubts above, we think the plain language of 
the IOIA refutes the notion of a de minimis exception. The 
IOIA speaks in terms of "immunity from suit and every form 
of judicial process," 22 U.S.C. s 288a(b) (emphasis added), 
language which admits of no exception for "unobtrusive" 
judicial processes. Cf. Stena Rederi AB v. Comision de 
Contratos, 923 F.2d 380, 392 (5th Cir. 1991) (holding that 
garnishment proceedings are not excepted from the general 
jurisdictional immunity provided to foreign sovereigns by 28 
U.S.C. s 1604, which provides that "a foreign state shall be 
immune from the jurisdiction of the courts of the United 
States and of the States.").

 Now to the more general, and more important, dispute 
between the parties--the scope of the immunity provided by 
the IOIA. The Bank submits that immunity under the IOIA 
is absolute and therefore poses a bar to any suit, regardless 
of its origin or subject matter. Appellant rejects that notion, 
contending that the IOIA, by virtue of its reference to "the 
same immunity from suit and every form of judicial process 
as is enjoyed by foreign governments," 22 U.S.C. s 288a(b) 
(emphasis added), incorporates the commercial activities ex-
ception to immunity,5 a central doctrine of the modern law 
governing the immunity of foreign governments from judicial 

__________
 5 We explicitly left this issue open in Broadbent v. Organization 
of Am. States, 628 F.2d 27, 32-33 (D.C. Cir. 1980).


process. She proceeds to argue that appellee's payment of 
wages to Kestell constitutes a commercial activity, so that her 
garnishment proceeding--a suit appellant depicts as arising 
out of that activity--is not barred.

 We begin with the text of the IOIA. The operative provi-
sion states:

 International organizations, their property and their as-
 sets, wherever located, and by whomsoever held, shall 
 enjoy the same immunity from suit and every form of 
 judicial process as is enjoyed by foreign governments, 
 except to the extent that such organizations may express-
 ly waive their immunity for the purpose of any proceed-
 ings or by the terms of any contract.

22 U.S.C. s 288a(b) (emphasis added). "International organi-
zation" is defined as:

 a public international organization in which the United 
 States participates ... and which shall have been desig-
 nated by the President through appropriate Executive 
 order as being entitled to enjoy the privileges, exemp-
 tions, and immunities provided in this subchapter.

22 U.S.C. s 288. Once the President issues such an order, 
his role under the IOIA does not cease. Rather, the Presi-
dent retains authority "by appropriate Executive Order" to 
"withhold or withdraw from any such organization ... any of 
the privileges, exemptions and immunities provided for in this 
subchapter ... or to condition or limit the enjoyment by any 
such organization ... of any such privilege, exemption, or 
immunity." Id. And in the extreme case, the President is 
authorized to "revoke the designation of any international 
organization." Id.
 The key phrase at issue in this case is the "same immunity 
... as is enjoyed by foreign governments." 22 U.S.C. 
s 288a(b) (emphasis added). Obviously, the 1945 Congress 
was legislating in shorthand, referring to another body of 
law--the law governing the immunity of foreign govern-
ments--to define the scope of the new immunity for interna-
tional organizations. But did the 1945 Congress mean to 
refer to the law governing the immunity of foreign govern-
ments as it existed in 1945, or to incorporate as well--as 

appellant claims--subsequent (i.e., post-1945) changes to that 
body of law? When Congress enacted the IOIA in 1945, 
foreign sovereigns enjoyed--contingent only upon the State 
Department's making an immunity request to the court--
"virtually absolute immunity." Verlinden B.V. v. Central 
Bank of Nigeria, 461 U.S. 480, 486 (1983); see Robert B. von 
Mehren, The Foreign Sovereign Immunities Act of 1976, 17 
Colum. J. Transnat'l L. 33, 41 (1978). In 1952, however, the 
landscape changed when the State Department announced its 
adoption of the restrictive theory of immunity, under which 
immunity is confined to suits involving the foreign sovereign's 
public acts, and does not extend to cases arising out of a 
foreign state's strictly commercial acts. Verlinden, 461 U.S. 
at 487 (citing Letter from Jack B. Tate, Acting Legal Adviser, 
Department of State, to Acting Attorney General Philip B. 
Perlman (May 19, 1952)). The State Department, following 
this restrictive theory, continued to make suggestions of 
immunity in appropriate cases, and the courts continued to 
defer to those suggestions as they had done prior to 1952. In 
1976, Congress addressed problems of political pressure and 
non-uniformity inherent in this dual branch scheme by codify-
ing the principle of restrictive immunity and shifting respon-
sibility for its application to the courts. Foreign Sovereign 
Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2892 
(codified as amended at 28 U.S.C. ss 1602-1611).

 As support for her contention that the 1945 Congress 
intended to incorporate in the IOIA post-1945 changes to the 
law governing the immunity of foreign sovereigns, appellant 
points us to this canon of interpretation: "A statute which 
refers to a subject generally adopts the law on the subject as 
of the time the law is enacted. This will include all the 
amendments and modifications of the law subsequent to the 
time the reference statute [i.e., the statute that makes the 
reference] was enacted." 2B Sutherland Statutory Con-
struction s 51.08, at 192 (Norman J. Singer, 5th ed. 1992) 
(footnotes omitted) (emphasis added). Before resorting to 
this or any other canon, however, we must search for indica-
tions of legislative intent. As the Supreme Court has ob-
served, canons of statutory interpretation are principally 

"useful in close cases, or when statutory language is ambigu-
ous." United States v. Monsanto, 491 U.S. 600, 611 (1989); 
see also United States v. United Mine Workers of Am., 330 
U.S. 258, 314 (1947) (Frankfurter, J., concurring) ("[A] canon, 
like other generalities about statutory construction, is not a 
rule of law. Whatever persuasiveness it may have in constru-
ing a particular statute derives from the subject matter and 
the terms of the enactment in its total environment."); Unit-
ed States v. Espy, 145 F.3d 1369, 1371 (D.C. Cir. 1998) ("Since 
we do not find the statute in the least bit ambiguous, we have 
no need to employ, nor any legitimate purpose in employing, 
canons of construction designed to reconcile confusing lan-
guage.").

 The text of the IOIA unfortunately provides no express 
guidance on whether Congress intended to incorporate in the 
IOIA subsequent changes to the law governing the immunity 
of foreign sovereigns. That does not mean, however, that the 
statutory text is completely unhelpful. As explained above, 
the IOIA sets forth an explicit mechanism for monitoring the 
immunities of designated international organizations: the 
President retains authority to modify, condition, limit, and 
even revoke the otherwise absolute immunity of a designated 
organization. See 22 U.S.C. s 288. It seems, therefore, that 
Congress was content to delegate to the President the re-
sponsibility for updating the immunities of international orga-
nizations in the face of changing circumstances. This built-in 
mechanism for updating the IOIA undermines appellant's 
claim that Congress intended a different updating mecha-
nism: automatic alteration of the scope of immunity under 
the IOIA in accordance with developments in the law govern-
ing the immunity of foreign sovereigns.

 The legislative history supports this reading. The Senate 
Report describes the provision delegating to the President 
the authority to modify an organization's immunities as "per-
mit[ting] the adjustment or limitation of the privileges in the 
event that any international organization should engage, for 
example, in activities of a commercial nature." S. Rep. No. 
861, 79th Cong., 1st Sess., at 2 (1945). Not only does this 
description of the President's role suggest that responsibility 
for modifying immunity granted by the IOIA rests with the 


President rather than with an evolving separate body of law 
(even if that separate body of law would be heavily influenced 
by the President acting through the State Department), it 
does so with specific regard to the notion of restrictive 
immunity for commercial activities. The concerns that moti-
vated the State Department to adopt the restrictive immunity 
approach to foreign sovereigns in 1952 (and Congress to 
codify those principles in the FSIA in 1976) were apparently 
taken into account by the 1945 Congress.

 In light of this text and legislative history, we think that 
despite the lack of a clear instruction as to whether Congress 
meant to incorporate in the IOIA subsequent changes to the 
law of immunity of foreign sovereigns, Congress' intent was 
to adopt that body of law only as it existed in 1945--when 
immunity of foreign sovereigns was absolute.6 (As we noted 
above, absolute immunity under the IOIA is merely a baseline 
that is subject to modification by executive order.) The 
canon appellant urges on us is but one factor in discerning 
Congress' intent, and we think it is outweighed by the text 
and legislative history in this case.

 There remains one final issue: the impact, if any, of the 
1976 enactment of the FSIA. The FSIA explicitly makes 
reference to the IOIA, a reference that appellant views as 
providing support for her claim that the IOIA incorporates 
post-1945 changes to the law governing the immunity of 
foreign sovereigns. 28 U.S.C. s 1611 provides:

 Notwithstanding the provisions of section 1610 of this 
 chapter, the property of those organizations designated 
 by the President as being entitled to enjoy the privileges, 
 exemptions, and immunities provided by the [IOIA] shall 
 not be subject to attachment or any other judicial pro-
 cess impeding the disbursement of funds to, or on the 
 order of, a foreign state as a result of an action brought 
 in the courts of the United States.

__________
 6 We accordingly disapprove of the contrary holding in Rendall-
Speranza v. Nassim, 932 F. Supp. 19, 23-25 (D.D.C. 1996).


Appellant draws two inferences, one general and one specific, 
from this passage. The general is that Congress' reference 
to the IOIA, in the course of this codification of the restrictive 
immunity doctrine for foreign sovereigns, indicates that Con-
gress was aware of the impact of the restrictive immunity 
doctrine on the IOIA; by choosing not to revise the IOIA, 
Congress expressed its intent to apply restrictive immunity to 
international organizations under the IOIA. We think this 
argument has little merit. Congress does not express its 
intent by a failure to legislate, United States v. Estate of 
Romani, 118 S. Ct. 1478, 1488 (1998) (Scalia, J., concurring), 
and even if it did, the will of a later Congress as to the 
meaning of a law enacted by an earlier Congress is of little 
weight, United States v. X-Citement Video, Inc., 513 U.S. 64, 
77 n.6 (1994); Estate of Romani, 118 S. Ct. at 1489 (Scalia, J., 
concurring) ("If the enacted intent of a later Congress cannot 
change the meaning of an earlier statute, it should go without 
saying that the later unenacted intent cannot possibly do 
so.").

 Appellant's alternative argument is that 28 U.S.C. s 1611, 
insofar as it prohibits "attachment or any other judicial 
process impeding the disbursement of funds [held by an 
IOIA-protected entity] to ... a foreign state as the result of 
an action brought in the courts of the United States or of the 
States" (emphasis added), gives rise to a negative implication 
that funds held by an IOIA-protected entity for disbursement 
to a non-foreign state (such as an employee) are not protected 
from attachment or garnishment. As best we can tell, appel-
lant relies on the canon expressio unius est exclusio alterius 
in making this argument. But we think the inference appel-
lant seeks to draw is rather strained. As we recently ob-
served, "the force [of the expressio unius canon] in particular 
situations depends entirely on context." Shook v. District of 
Columbia Fin. Responsibility and Management Assistance 
Auth., 132 F.3d 775, 782 (D.C. Cir. 1998). Here, context 
suggests, if anything, that the 1976 Congress wished to clarify 
that international organizations deserve special protection. 
In ss 1609 through 1611 of the FSIA, Congress focused on 
the issue of when and how judgments could be enforced 


against the property of foreign states. Section 1609 states 
the general rule that the property of foreign states is immune 
from attachment or execution, and s 1610 sets forth excep-
tions to the general rule that are roughly analogous to the 
commercial activity exception to jurisdictional immunity in 
s 1605. Section 1611 then provides that notwithstanding 
s 1610, a judgment creditor cannot execute upon funds held 
by international organizations for disbursement to the foreign 
state judgment debtor. Thus, it is clear that Congress' 
emphasis in these provisions of the FSIA was on the situation 
of a foreign state as judgment debtor, not on other types of 
judgment debtors. The FSIA is "beside the point" because it 
does not "reflect any direct focus by Congress upon the 
meaning of the earlier enacted provisions" of the IOIA. 
Almendarez-Torres v. United States, 118 S. Ct. 1219, 1227 
(1998) (citations omitted).

 IV.

 Even if we concluded that the IOIA's reference to the law 
of immunity of foreign sovereigns is an evolving one that 
incorporates the commercial activities exception to immunity, 
we think appellant's garnishment proceeding would not come 
within that exception. As relevant here, the FSIA's formula-
tion finds the commercial activities exception satisfied where 
"the action is based upon a commercial activity carried on in 
the United States by the foreign state." 28 U.S.C. 
s 1605(a)(2). To determine whether an action is "based upon 
a commercial activity," we look to "those elements of a claim 
that, if proven, would entitle a plaintiff to relief under his 
theory of the case." Saudi Arabia v. Nelson, 507 U.S. 349, 
357 (1993).

 A garnishment proceeding would require appellant to dem-
onstrate two principal elements. To obtain a writ of garnish-
ment, appellant would need to show the amount of the debt 
owed by Kestell to her and the judgment giving rise to that 
debt. D.C. Code s 16-501(c)(1)-(2). To levy the writ on the 
Bank as garnishee, appellant would have to demonstrate that 
the Bank owed wages to Kestell. Id. s 16-544. Neither of 


these elements relates to a commercial activity of the Bank. 
The judgment appellant seeks to enforce arises out of Kes-
tell's desertion of her and the resulting grant of divorce by 
the Maryland state court. Kestell, though an agent of the 
Bank, certainly cannot be said to have engaged in these 
marital (or more accurately, "anti-marital") activities in his 
official capacity as an agent of the Bank. See Jungquist v. 
Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1028 
(D.C. Cir. 1997) ("[T]he relevant inquiry in determining 
whether an individual was acting in an official capacity focus-
es on the nature of the individual's alleged actions."). Nor is 
the Bank's payment of wages to Kestell a commercial activity. 
See Broadbent v. Organization of Am. States, 628 F.2d 27, 34 
(D.C. Cir. 1980) (holding that an international organization's 
employment of civil servants, regardless of their nationality, 
is not a commercial activity).

 Because neither of these principal elements of a garnish-
ment proceeding rests on a commercial activity of the Bank, 
the commercial activities exception would not apply and the 
Bank would remain immune from jurisdiction under the 
general rule of 28 U.S.C. s 1604. The judgment of the 
district court is

 Affirmed.