Catherine S. TUNIS, Plaintiff,

v.

CORNING GLASS WORKS, Defendant.

No. 86 Civ. 1074 (RLC).

United States District Court,
S.D. New York.

Aug. 6, 1990.

Spivak, Lipton, Watanabe & Spivak, New York City, Franklin K. Moss, Ann Weinfeld Schulman, of counsel, for plaintiff.

Reed Smith Shaw & McClay, Pittsburgh, Pa., Shearman & Sterling, New York City, Scott F. Zimmerman, Mark A. Fontana, of counsel, for defendant.

ROBERT L. CARTER, District Judge.

## I.

Catherine Tunis was employed by Corning Glass at its Fall Brook plant beginning

April 1, 1976, as a process engineer in glass technology. In 1976, there were about 300 production and maintenance workers and 50 salaried employees at the plant, of which 25 were in the engineering department in which Tunis worked.

Morning production meetings were held daily. It was Tunis' job to identify quality defects in the tubing where the glass was being formed and to give her findings at the morning meetings as to the cause of the flaws she discovered. To accomplish this assignment Tunis had to mark the defects, take samples and examine them under a microscope in an attempt to determine the cause of the problem. During her training period she performed these tasks under the supervision of Dennis Kauser, her immediate supervisor. After completion of her training in May, she was expected from June onward to perform the defect analysis function on her own.

The morning meetings focused around correcting the problems which had been found. From time to time, after her training period ended, Tunis was not prepared to give a full report about all the defects in the tubing. On occasion she was unprepared to give an analysis of the defects she had found, or she had not completed the required investigation of the contents of all the operating tubing.

On or about April 15, Tunis complained to Charles Francik, plant manager, about photographs of naked or nearly naked women in sexually suggestive poses displayed on the walls along the passage-way she used in going to the glass laboratory and mix house. She told Francik that she had discussed the matter with Equal Employment Opportunity Commission ("EEOC") officials and had been assured that such displays were in violation of the law banning sex discrimination in the workplace. Francik advised Tunis that public displays of the sort she described were at odds with company policy and that he would have the photographs removed.

Francik then made an immediate tour of the area Tunis would walk through, and the next morning he went through the entire plant. He found pinup photographs in the mix house, on the door of the paint shop and in the teaser shanty—the trades area where employees involved in maintenance and construction worked. Francik ordered Carlo Merletti, department head of the trades area, to remove the material and to make a tour of the area to look for any such material he might have missed.

On or about April 23, Tunis again complained that offensive photographs were still on display. Francik sent Merletti to look for the display, but Merletti reported he could find nothing. Francik then had Merletti accompany Tunis to locate the material. It turned out to be a postcard on the inside cover of the tool box of one of the maintenance employees. It was ordered removed. Thereafter, Tunis made no further complaints to Francik about any pinup displays.

Going with Merletti to locate the postcard exposed Tunis as the individual who caused the removal of the photographs. Thereafter, on trips to the glass laboratory and mix house, she was greeted with whistles, catcalls and grunts. On one occasion two hourly employees remarked in her presence in sufficient volume for her to hear that she was okay but they could not tell about her legs because she always wore pants. She told them "to fuck off."

When Tunis complained to Francik about being whistled at in the trades area, he personally went to the area to speak to the union representative and several other supervisors and employees he regarded as influential. He explained to them that he did not want such activity to continue, that it was inappropriate, that he specifically disapproved of such conduct, and he asked for their cooperation in having it stopped. He heard no further complaints from Tunis about being whistled at.

Tunis also complained to Jack Stumpf, plant manufacturing engineer and the immediate supervisor of Kauser, who was Tunis' immediate superior, about the whistling. Stumpf spoke to the union steward of the trades group and asked him to speak to the group and indicate that such conduct was inappropriate. He asked the steward to identify anyone he knew who might be

doing the whistling so that Stumpf could speak to them directly.

Tunis complained subsequently that she was still being whistled at. Stumpf convened a meeting in his office with Tunis, Merletti and Art Mayo, the union committeeman. Tunis told them about the catcalls and whistles, and Stumpf indicated that such conduct was unprofessional and inappropriate in a business climate. Tunis stated that those responsible should be discharged. She could not, however, name the culprits and did not identify them by description. Her proposed solution led to protracted discussion with the union representative about what steps the union required in disciplining employees. There was an unwillingness to go to the extreme of terminating the offenders. Nothing concrete seems to have come out of this meeting, but Stumpf received no further complaints from Tunis on this subject.

Tunis was very much concerned about the use of gender based job titles, language and terminology. She would constantly interrupt people, whether she was a participant in the conversation or not, to correct their usage if gender based language or terminology was used. Steve Clair, the melting department head, and Jean Gauthier, the forming department head, complained that when they would try to explain something to Tunis she would interrupt to correct their speech. At one of the morning meetings a senior process engineer had been asked to attend to make a presentation. Tunis kept interrupting him to correct him when he would say such things as tank man or cullet man. He became so upset that he walked out of the meeting. Gauthier also testified that Tunis prolonged the morning meetings by rudely correcting people's language.

Gauthier was awakened in the early morning hours on two consecutive occasions because the log book which he used to communicate with his shift supervisors was not legible. Gender based words had been crossed out along with other words, so that what had been written made no sense. Later on he came upon Tunis in the act of crossing out words in the log book.

She was told by Kauser not to do that again, and there was no repetition of log book tampering.

On March 24, 1976, before Tunis commenced her tour of duty at Fall Brook, a memorandum had been sent to company supervisory personnel changing salaried position titles to eliminate their gender based orientation. Shift foreman, for example, was changed to shift supervisor, section foreman to section supervisor, draftsman to drafting technician, etc. When Tunis complained about the continued use of sex based terminology, Francik had a new memorandum, dated May 13, 1976, sent to all personnel reiterating company policy that sex based terminology was no longer appropriate.

Tunis testified that, after she had become known as the cause of the removal of the pinup displays, she was often kept locked in the outer area when she sought entry into the plant in the morning. One had to be let into the plant by security personnel, who would buzz you in on the showing of proper identification. After showing the proper identification, however, she would still be denied access to the plant until other employees arrived, when she then would pass through with them. Francik testified that the security people on duty would become distracted by a phone call or some other matter and would at times forget to buzz him in promptly.

The work day was 8–5. Tunis arrived at about 8:10–8:15 and worked until 6 or later. In the beginning she arrived at 8, but was locked out and then she began arriving at 8:15 or 8:20. Because of some construction which blocked access to her office, arriving at 8 was a problem for about 6 weeks, but her late arrivals to work continued after the construction was no longer the problem.

At the trial some emphasis was put on the tardiness issue, but it was conceded that the tardiness *per se* was not management's real complaint about Tunis. Her tardiness, however, meant that she did not arrive early enough to inspect and analyze the defects in the tubing, and, therefore, was not properly prepared at the morning

meetings when she was supposed to give her analysis of the kind, nature and causes of the defects she had found in her inspections and microscopic examinations. Kauser testified that he typically arrived at work at 7:45; that he did not go directly to his office. Instead, since Tunis was usually late getting to work and, therefore, could not be relied on to start looking for glass defects, or be prepared to give the morning reports,, he would go out in the plant to investigate the glass formations. He would then be prepared to start the morning meetings without her.

On one occasion Tunis found an envelope full of condoms on her desk. At the trial it was testified that the envelope contained finger guards used to avoid damaging surfaces in handling the glass, not condoms. Defendant conceded, however, that these objects had no business being placed on Tunis' desk and that investigation had failed to uncover the culprit.

Kauser was angered that Tunis had taken her complaints to Francik, rather than bringing them first to him. Tunis felt that he became hostile and uncooperative thereafter. As proof of Kauser's hostility she related a story he had told her, which one of his employers had told him, to the effect that an employer did not have to fire an employee but could make life so unpleasant that the individual would quit. Tunis took that as a warning that Kauser intended to make her stay at the plant as miserable as possible.

According to Kauser, he was angry, not about the nature of her complaints, but that she had gone over his head to the plant manager. While he had no direct control over the hourly employees in whose area the offensive photographs were displayed, he could have worked through his immediate superiors to get the matter resolved. He said he told the story to everyone and that while it could be interpreted to mean that an employee could be made to quit by life being made miserable on the job, the other message was that one should never take anything for granted. He said he understood being by-passed, but he wanted to be sure it did not happen again.

Tunis complained to Stumpf that Kauser's assignments were confusing and arbitrary and that she was not clear as to her responsibilities. Stumpf spoke to Kauser and asked him to prepare in writing an outline of Tunis' job. When Kauser gave her the outline he had prepared, she objected to the job description on the grounds that she was being required to do more than she should.

Stumpf met with Tunis and Kauser in his office in July to review the outline with both of them. His purpose was to make sure Tunis understood her assignments and that the designations of her responsibilities in the outline were reasonable because of her complaints about Kauser being autocratic and ambiguous. Stumpf confirmed that the job description was proper.

In or about July, Stumpf noticed more and more that Kauser was giving reports which Tunis should have been giving. He told Tunis at an early July meeting that her performance was not up to standard. There were complaints from the melting, quality control and forming departments that Tunis was quite rude and cold in dealing with them. She had to interact with these people every day to obtain their assistance in determining the causes for whatever glass flaws her investigations uncovered.

In late July Stumpf again told Tunis that her job performance was not satisfactory, that she was not interacting properly with her co-workers, and that she was not prepared at the morning meetings to give a full and complete report on many occasions. She was advised that she had to correct her interpersonal relations at the plant, get to work on time and complete her assignments satisfactorily and that if there was no improvement her job was in jeopardy. He saw no evidence of improvement.

Francik testified that earlier on in Tunis' training it was pointed out that she was difficult to get along with, and the two people with chief responsibility for her training did not want to train her because they found her rude and discourteous.

Kauser had an evaluation session with Tunis on September 17, and told her he was

recommending termination. At the trial Kauser testified that the factor which triggered his recommendation that Tunis be let go was her refusal when he reviewed his evaluation with her to concede that there was anything wrong with her performance. This convinced him that she would not improve.

Kauser went to see Stumpf to go over the evaluation with him, and they both agreed that her performance was unsatisfactory, that she was not carrying out her responsibilities, that Kauser was required to perform her tasks, that she missed critical meetings because of tardiness, and that she was not a constructive member of the company and was disruptive in her frequent efforts to change the conduct of others.

While Kauser was absent from his desk, Tunis went through her personnel file which Kauser had left on his desk and found in her file a copy of *Donaldson v. Pillsbury*, a Title VII sex discrimination case, with notations which appeared to be applicable to her situation. She had the case copied. When Kauser returned, he found her going through the papers. The two of them went to see Stumpf, and she was advised that she was being terminated.

Stumpf then informed Francik in the latter's office of his and Kauser's decision that Tunis should be let go. Francik went to the office of Dan Lammon, the affirmative action officer, to discuss the matter with a few colleagues. Stumpf attended this meeting. Kauser arrived late, reported his evaluation of Tunis as unsatisfactory and his recommendation that she be terminated.

At the trial neither Kauser nor Stumpf recalled being at this meeting. Trial exhibits and Francik's testimony place both at the meeting in Lammon's office, Kauser only for a short time to report his evaluation of Tunis and his recommendation, concurred in by Stumpf that she be terminated.

The day before termination, Lammon was notified that Tunis had filed an EEOC charge. *See,* Exhibit 21. Francik, however, did not recall any EEOC charges being mentioned at the meeting.

Tunis was unemployed from September, 1976, until January, 1978, at which time she went back to school. She received a masters degree in forestry from Duke University in December, 1980; worked for Resources for the Future from December, 1980, until May, 1983; then was unemployed until February, 1984, when she worked for the Census Bureau for a while and then for the U.S. Forestry Service, also short term employment. She was unemployed from June, 1985, until July, 1986, when she took her present job with the Environmental Protection Agency.

## II.

Tunis had called the EEOC in mid-April to inquire about whether she had a right under Title VII of the Civil Rights Act of 1964 to complain about the photographs and the use of gender based job titles. She filed a charge with the EEOC in August, 1976, and received a letter from the agency dated August 27th telling her to file with the State Commission as well. The Monday following her termination she filed a charge with the New York State Division on Human Rights ("NYSDHR"). Her charge related to the photographs, the gender based terminology, the whistling and her discharge.

Defendant was not officially notified of the charge until November, but the record shows that Tunis had advised her superiors in April of her contacting the EEOC, and there are indications that the defendant's affirmative action officer had knowledge of the filing on the day of her termination.

In March, 1977, plaintiff filed an amended charge with the EEOC, adding a charge that her discharge was in retaliation for her filing a charge with the EEOC.

The matter proceeded before the NYSDHR. On February 28, 1983, the Administrative Law Judge issued a decision and order recommending dismissal of the charge, finding that plaintiff had not been subjected to discrimination because of her sex or in retaliation. On April 6, 1983, the Commissioner of the NYSDHR ordered the

charge dismissed. An appeal was taken in the state courts, but plaintiff later withdrew the appeal.

The EEOC adopted the determination of the NYSDHR and dismissed the charge. A Right to Sue Letter, dated September 25, 1985, was received by plaintiff on October 1, 1985. On February 1, 1986, plaintiff filed the instant action. Procedural issues such as the complaint being untimely because filed more than 90 days after receipt of the Right to Sue Letter and because of laches were disposed of in an Endorsement dated March 25, 1987, and in an opinion reported at 698 F.Supp. 452 (S.D.N.Y.1988), with which familiarity is assumed. Accordingly, we proceed to the merits.

### III.

■ Plaintiff asserts claims of sex based discrimination in her employment at Fall Brook in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She asserts that she was the victim of sexual harassment in that she was required to work in a hostile environment and was subjected to *quid pro quo* discrimination. In addition, she claims her discharge was in retaliation for her filing a charge with the EEOC or because she protested against work place activities or conditions outlawed by Title VII. Both claims are cognizable under Title VII, and, if proved, mandate remediation.

■ Title VII was purposed "to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (*quoting Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971)). To succeed on a hostile environment claim, Title VII requires that the harassment be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank FSB v. Vinson, supra,* 477 U.S. at 67, 106 S.Ct. at 2405. The incidents must be more than casual or incidental. The harassment must be concerted and continuous so that it becomes pervasive, *Carrero*

*v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir. 1987), and must be of such nature as to interfere with the work performance and emotional well-being of a reasonable person. *Koster v. Chase Manhattan Bank,* 687 F.Supp. 848, 862 (S.D.N.Y.1988) (Daronco, J.). In the final analysis, it is the totality of the circumstances that determines whether sexual harassment activity rises to the level of a Title VII violation. *Carrero v. New York City Housing Authority, supra,* 890 F.2d at 577–578.

■ An employer is answerable to a hostile environment claim only if it is established that the employer was aware of or should have been aware of the sexual harassment and failed to take reasonable measures to eliminate the offensive activity. *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986).

A fair evaluation of the evidence in the instant case requires the conclusion that this claim must fail. Plaintiff bases her hostile environment contention on the presence of photographs of the naked or nearly naked women in sexually provocative poses, the whistling and catcalls of the hourly employees, and the prevalent use of gender based language by co-workers.

■ When confronted with Tunis' complaint about the pinup photography, Francik advised her that unauthorized material posted on the plant walls was contrary to plant policy and proceeded immediately to take steps to have the photographs removed. When plaintiff came to him a second time to complain that the photographs had not been removed, he dispatched a supervisor to inspect the plant to locate the pinups and have them removed. When advised that nothing was found, he sent Tunis along to point out where she had seen the photographs. What was found was a postcard sized picture on the inside cover of the tool box of one of the men in the mix house. That picture was ordered removed from the tool box.

Plaintiff had to traverse the area where these photographs were located on her

morning inspections for defective glass formations. There is no evidence of such displays on the walls of the office to which she was assigned or in any of the adjacent areas where she spent most of the work day. Moreover, the complaint was dealt with promptly. The fact that after she made her first complaint to management one man was found to have a pinup type postcard on the inside cover of his tool box is insufficient to support a conclusion that defendant failed to take reasonable remedial action promptly. Indeed, the evidence is clear that Francik and Stumpf took immediate corrective measures, and that Tunis was no longer confronted with pinup photography in any public area or space throughout the plant.

■ The use of gender based language and terminology shown in this record does not constitute a Title VII violation. It must be borne in mind that these events took place in 1976, which probably marked the beginning or near beginning of awareness that describing various supervisory jobs with male gender titles was a not so subtle indication that such jobs were not open to women. However, even before Tunis came on board, defendant had recognized the discriminatory nature of the practice and had instituted a company policy designed to eliminate gender based job titles. While the work force continued the traditional usage, after Tunis' complaint, a new memorandum reinforcing the company's effort to eliminate gender based job titles was issued to all plant personnel.

Defendant contends that since there is no evidence of complaint about this issue from other female employees at the plant, the reasonable person's yardstick, *see Koster v. Chase Manhattan Bank, supra,* requires rejection of this claim. Although defendant's reasoning need not be adopted, the claim cannot survive simply because under the circumstances of this case defendant took reasonable steps to eliminate the discriminatory features of its job titles.

■ The whistling, catcalls, etc., were directed at the plaintiff personally, unlike the photographs and gender based terminology, neither of which were specifically aimed at plaintiff. No female employee should be required to confront whistling, catcalls or other sexually suggestive noises from male employees, individually or in groups. Francik and Stumpf took steps to have this form of harassment stopped. After their taking prompt action to inform those with influence among the men doing the catcalling that such activity was inappropriate and specifically disapproved, Tunis did not complain again to either man about this issue. Since prompt remedial action reasonably calculated to resolve the problem was taken, a claim of sexual harassment based on this complaint under Title VII cannot prevail. *Barrett v. Omaha National Bank,* 726 F.2d 424 (8th Cir. 1984).

■ There is no evidence that Tunis brought the incident when the two men commented about not being able to see her legs to management's attention. That incident, therefore, cannot form the basis of any claim in the instant litigation since it was both incidental and isolated, *Meritor Savings Bank FSB v. Vinson, supra,* and involves activity for which management is liable only in failing, once made aware of the harassment, to take reasonably designed corrective measures.

■ Strict liability attaches to an employer on a *quid pro quo* harassment claim. *Id.,* 477 U.S. at 70–71, 106 S.Ct. at 2407–08; *Carrero v. New York City Housing Authority, supra,* 890 F.2d at 579; *Henson v. City of Dundee,* 682 F.2d 897, 905 n. 9 (11th Cir.1982). However, the *quid pro quo* claim appears to have no basis whatever on this record. Plaintiff contends that a *quid pro quo* violation need not involve a sexual proposition, and this record certainly reveals none. Nonetheless, there surely must be some gender based impropriety. There is none here. Francik's advice to Tunis that her approach was not the best way to get results cannot in fairness be construed as suggesting that Tunis should accept without complaint the use of gender based terminology, the whistling or the pinup display. In each instance he had condemned what she complained about and had taken prompt corrective ac-

tion to deal with the problems. On the contrary, his remarks were addressed to her apparent inability to get along with the people she was required to interact with to complete her assigned tasks successfully. As a glass technical engineer, particularly one just learning what the job involved, she could not continue to be considered stand-offish, antagonistic and unfriendly to those fellow workers from whom she had to learn how best to accomplish her assignments. Francik was merely advising Tunis that a friendlier approach to her colleagues would produce better results. There is no basis for any *quid pro quo* claim in this case.

■■■ Plaintiff contends that she was terminated either because she refused to be passive and accepting about the hostile environment issues or because she filed a charge with the EEOC. Claims of retaliation under Title VII require a three step approach. Plaintiff must first make out a prima facie case of retaliatory discrimination. *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593–595 (2d Cir.1988). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. "The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (citation omitted); *Manoharan v. Columbia University College of Physicians & Surgeons, supra*, 842 F.2d at 594–95. The defendant must clearly establish through admissible evidence the reasons for the plaintiff's termination. "The explanation must be legally sufficient to justify a judgment for defendant." *Texas Department of Community Affairs v. Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the discharge. Plaintiff retains the ultimate burden of per-

suading the court that she is an intentional victim of discrimination. *Id.*

■■■ The court has serious doubts that the plaintiff has made a prima facie case of retaliatory discrimination since there is insufficient evidence that defendant fired Tunis because she complained about the pinups, usage, or the catcalls. Nor is there any credible evidence that she was fired because of knowledge of her EEOC filing. Francik knew that she had been in contact with the EEOC in April. She told him that she had such contact. An exhibit shows that Lammon had knowledge of the EEOC filing on the day of her discharge. Neither Kauser, Stumpf nor Francik remembers being advised of this fact at that time. One could conclude that since Lammon had knowledge of the filing that it must have been brought to Francik's attention. One could also conclude that Lammon, being involved in the company's affirmative action program, deliberately refused to divulge this information to Francik in order not to compromise the decision. In any event the decision of Kauser and Stumpf was initially made and that decision was communicated to Francik before any of the three men went to Lammon's office. Thus the record cannot support a holding that retaliation for the EEOC filing generated the discharge apparatus.

■■■ However, for the purpose of this analysis, even assuming *arguendo* that a prima facie case has been made, defendant has articulated legally sufficient non-discriminatory reasons for Tunis' termination. *Texas Department of Community Affairs v. Burdine, supra*. She did not perform her assignments; she did not get along with her colleagues. She could not accept the fact that she was not performing up to par and therefore defendant had little hope that her performance or attitude would improve in the future. These are certainly legitimate reasons to terminate an employee.

Plaintiff has not persuaded the court that the proffered reasons for her discharge are pretextual or that she has been victimized by sex discrimination. Accord-

ingly, all claims are dismissed and judgment is entered in favor of defendant.

IT IS SO ORDERED.