Clara ZVEITER, Plaintiff,

v.

BRAZILIAN NATIONAL SUPERINTEN-
DENCY OF MERCHANT MARINE and
Lloyd Brasileiro, Defendants.

No. 92 Civ. 3548 (SS).

United States District Court,
S.D. New York.

Oct. 14, 1993.

Shustak Jalil Sanders & Heller by Gayle S. Sanders, New York City, for plaintiff.

Milbank, Tweed, Hadley & McCloy by Eugene F. Farabaugh, New York City (John W. Dean, Charles E. Dropkin, Louis L. Nock, of counsel), for defendants.

### AMENDED OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendants Brazilian National Superintendency of Merchant Marine ("BNSMM"), now known as the Brazilian National Department of Waterway Transportation, and Lloyd Brasileiro ("Lloyd") move for summary judgment to dismiss this sexual harassment action. For the reasons stated below, the motion is **DENIED.**

### I. Background

Defendant Lloyd is a navigational shipping corporation established under the laws of Brazil. As Brazilian law requires, Brazil owns a majority of Lloyd's shares. Defendant BNSMM is a regulatory agency of Bra-

zil, established pursuant to executive decrees of the Brazilian government, and charged with jurisdiction over navigational waterways.

Lloyd and BNSMM share a combined New York office, which is headed by a Delegate and an Assistant Delegate. During the times relevant to this action, the Delegate was Jose Vinhae, and then Juca Colagrossi. The Assistant Delegate was Edward Crouch.

Plaintiff Clara Zveiter was a secretary to the Delegate and Assistant Delegate. One week after Mr. Colagrossi took over as Delegate, Ms. Zveiter asked for a twenty day vacation, and while she was on vacation, Irene Romanelli substituted for her as a secretary. One week after plaintiff returned from vacation, she was permanently replaced by Ms. Romanelli and was reassigned to serve as a receptionist, without diminution in salary or benefits. Subsequently, plaintiff and three other male employees were terminated.

Plaintiff brought this suit claiming sexual harassment, in violation of the New York Human Rights Law. She also alleged discrimination on the basis of her religion, but she has withdrawn that claim. She has also withdrawn her claim for intentional infliction of emotional distress. The status of an additional claim, for overtime compensation, is unclear, but appears to have been abandoned.

Defendants move for summary judgment dismissing the action on the grounds that they are immune from suit by virtue of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611; that plaintiff has failed to state a claim for sexual harassment; and that plaintiff released the defendants from suit by signing a waiver shortly after she was terminated.

## II. *Discussion*

### A. *Subject Matter Jurisdiction and The Foreign Sovereign Immunities Act*

Defendants argue first that this Court lacks subject matter jurisdiction over plaintiff's claims because the defendants are immune from suit by virtue of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989); 28 U.S.C. § 1330. The jurisdiction created by the FSIA, however, extends only to those claims "with respect to which the foreign state is not entitled to immunity either under [28 U.S.C. §§ 1605–1607] or under any applicable international agreement." 28 U.S.C. § 1330(a). Thus, defendants' motion presents an inquiry that must be addressed in two steps: first, I must determine whether the defendants are a "foreign state" within the meaning of the FSIA. If so, section 1330(a) is the exclusive means by which this Court may exercise subject matter jurisdiction over the action, and defendants are presumptively immunized from suit by virtue of 28 U.S.C. § 1604. *Saudi Arabia v. Nelson*, —— U.S. ——, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). That leads to the second question: whether this action comes within one of the exceptions to immunity provided by 28 U.S.C. § 1605.

### *Are the Defendants a Foreign State?*

■ Under 28 U.S.C. § 1603(a), a "foreign state" is defined to include its agencies and instrumentalities. An "agency or instrumentality of a foreign state" is any entity

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Defendant Lloyd is a navigational shipping corporation organized by the Federal Government of Brazil pursuant to executive decrees, and the Brazilian government owns at

least 51% of its shares, as required by Brazilian law. As an individual corporate entity "a majority of whose shares or other ownership interest is owned by a foreign state," 28 U.S.C. § 1603(b)(2), and as plaintiff concedes in her Rule 3(g) statement, Lloyd is an agency or instrumentality of Brazil.

Defendant BNSMM, now known as the Brazilian National Department of Waterway Transportation,[1] is a regulatory agency of the federal government of Brazil with jurisdictional authority over navigational and merchant marine affairs on the high seas. As such, it is an agency or instrumentality of Brazil.

Thus, I conclude that there is no disputed question of material fact regarding the status of the defendants. As a matter of law, they are agencies or instrumentalities of Brazil and a "foreign state" within the meaning of the FSIA, and therefore 28 U.S.C. § 1330(a) provides the exclusive basis for this Court's exercise of subject matter jurisdiction over the action.

■ The sole allegation of subject matter jurisdiction in the complaint, however, refers to diversity jurisdiction pursuant to 28 U.S.C. § 1332. Although Fed.R.Civ.P. 8(a) requires that the Complaint contain "a short and plain statement of the grounds upon which the court's jurisdiction depends," and the Complaint is undeniably defective in that regard, the pleadings to date have established a prima facie showing of subject matter jurisdiction. Therefore, I will not dismiss this action for lack of subject matter jurisdiction, but instead grant leave to amend the complaint. I do so because absent sovereign immunity, such jurisdiction does lie with this Court, albeit pursuant to section 1330, and because the erroneous allegation of subject matter

jurisdiction in this case may be regarded as a mere pleading error.

### Sovereign Immunity

The FSIA creates the sole basis for jurisdiction over a suit against a foreign state, and at the same time bestows sovereign immunity upon the defendant foreign states unless the action falls within one of the enumerated exceptions to the presumption of immunity. 28 U.S.C. § 1604. The plaintiff contends that this case comes under the first clause[2] of the "commercial activity exception" to sovereign immunity, which permits a federal court to exercise jurisdiction in an action otherwise barred by the FSIA if "the action is based [1] upon a commercial activity carried on in the United States by the foreign state...." 28 U.S.C. § 1605(a)(2).

Zveiter claims that she was sexually harassed while employed as a secretary by defendants in the United States, and therefore the commercial activity relevant to this action is defendants' employment of plaintiff. I must thus determine whether the employment of a secretary is a "commercial activity" under the FSIA.

Like all questions of statutory interpretation, "[t]he starting point is 'the language of the statute itself.'" *United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (citation omitted). Under the FSIA, "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). This definition is "somewhat circular," since it defines "commercial activity" in terms of "commercial conduct" and "commercial transaction." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1108 n. 6 (5th Cir.1985).

---

1. At oral argument, plaintiff explained that she disputed the contention in defendants' Rule 3(g) statement that BNSMM "is currently an agency of the Federal Republic of Brazil," apparently because of the name change. Plaintiff has failed, however, to offer any reason why the name change should affect BNSMM's status as an agency of Brazil.

2. In the initial briefing for the motion at bar, reference was made only to the first clause of the commercial activity exception. An Order of the

Court dated May 28, 1993, directed the parties to address the applicability of the second clause of the commercial activity exception, which applies to an action based "[2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere", and they submitted additional briefing on this issue. Because I am concluding that the first clause is applicable to this case, I do not address this second clause.

■ The Supreme Court recently considered the applicability of the "commercial activity" exception to foreign sovereign immunity. *See Saudi Arabia v. Nelson,* —— U.S. ——, ——, 113 S.Ct. 1471, 1479, 123 L.Ed.2d 47 (1993). The Court began its analysis by explicating the "restrictive" theory of foreign sovereign immunity that Congress adopted when it enacted the FSIA:

> Under the restrictive, as opposed to the "absolute," theory of foreign sovereign immunity, a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii* ), but not as to those that are private or commercial in character (*jure gestionis* ).

—— U.S. at ——, 113 S.Ct. at 1479 (citations omitted). Thus, "a state engages in commercial activity under the restrictive theory where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.' " *Id.* (citations omitted).

In *Nelson,* plaintiff worked in Saudi Arabia at a hospital owned and operated by the Saudi government. After he reported a number of safety defects that he had observed on the job, he was arrested by Saudi government officials, jailed, tortured, and beaten. He subsequently sued in a federal court, alleging various intentional torts. The Supreme Court held that since "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce," the intentional conduct that plaintiff had alleged could not qualify as commercial under the restrictive theory. —— U.S. at ——, 113 S.Ct. at 1479.

By contrast, this action does not arise from activities that are "peculiarly sovereign in nature." *See Id.* The employment of a secretary is hardly within the unique sphere of sovereign authority. *See Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the 'FSIA.' "). Rather, in employing a secretary, the foreign sovereign enters the marketplace and acts just as a

private party would in engaging in this "commercial activity." It is of no consequence that the purpose of employing the secretary was to further the sovereign mission of the foreign state, since "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

My conclusion that the employment of Zveiter was "commercial" is borne out by the legislative history of the FSIA, to which courts have frequently turned for interpretational guidance. *See, e.g., Nelson,* —— U.S. at ——, ——, 113 S.Ct. at 1481, 1484 (White, J., concurring) (discussion of commercial activity); *Barkanic v. General Administration of Civil Aviation of the People's Republic of China,* 923 F.2d 957 (2d Cir.1991) (discussion of legislative history of FSIA in choosing appropriate choice of law rule); *Letelier v. Republic of Chile,* 748 F.2d 790, 796–97 (2d Cir.1984) (discussion of commercial activity), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

According to the Report of the House Judiciary Committee, "the employment of American citizens or third country nationals [as civil service personnel] by the foreign state in the United States," in contrast to the employment of citizens of the foreign sovereign, "would be commercial." H.R.Rep. No. 94–1487, 94th Cong., 2nd Sess. 16 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6614. Although it "seemed unwise to attempt an excessively precise definition" of commercial activity, it was intended that "[a]ctivities such as a foreign government's ... employment or engagement of laborers, clerical staff or public relations or marketing agents ... would be among those included within the definition." *Id.* Zveiter is an American citizen, and her employment by the defendants on their clerical staff is therefore a "commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2).

Defendants cite a number of cases that concern international organizations for the proposition that the employer-employee relationship is beyond the purview of the com-

mercial activity exception of the FSIA. Even though the International Organizations Immunities Act of 1945, 22 U.S.C. § 288a(b), confers on international organizations "the same immunity from suit ... as is enjoyed by foreign governments," a narrower interpretation has been given to "commercial activity" as it concerns the employment of civil servants by international organizations than the employment of civil servants by foreign states. *See, e.g., Broadbent v. Organization of American States,* 628 F.2d 27 (D.C.Cir. 1980).

In *Broadbent,* the Court of Appeals for the D.C.Circuit considered the legislative history of the FSIA, and noted that the House Report "clearly marks employment of civil servants as noncommercial for purposes of restrictive immunity," but that it "establish[es] an exception from the general rule in the case of employment of American citizens or third country nationals by foreign states." 628 F.2d at 34, quoting H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 16 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6614.

By contrast,

[a] comparable exception is not applicable to international organizations, because their civil servants are inevitably drawn from either American citizens or "third" country nations ... [and] such an exception [for international organizations] would swallow up the rule of immunity for civil service employment disputes.

*Id.* Thus, the case at bar is distinguishable from the international organization cases because it involves the employment of an American citizen by a foreign state rather than by an international organization.

3. A similar rationale animated the Court of Appeals in *Mendaro v. World Bank,* 717 F.2d 610, 615–16 (D.C.Cir.1983), which observed that

The purpose of immunity from employee actions is rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory. The sheer difficulty of administering multiple employment practices in each area in which an organization operates suggests that the purposes of an organization could be greatly ham-

Because the hiring of civil servants by international organizations implicates different policies than the same act when performed by foreign states,[3] as the D.C.Circuit recognized in *Broadbent,* and as Congress recognized in enacting the FSIA, defendants' reliance on cases involving international organizations is misplaced. *See Tuck v. Pan American Health Organization,* 668 F.2d 547 (D.C.Cir.1981) (international health organization); *Boimah v. United Nations General Assembly,* 664 F.Supp. 69 (E.D.N.Y.1987); *Chiriboga v. International Bank for Reconstruction,* 616 F.Supp. 963 (D.C.D.C.1985).

Thus, on the basis of the language of the FSIA, its legislative history, the recent decision of the Supreme Court in *Nelson,* and the distinguishability of the international organization cases, I conclude that the defendants' employment of Zveiter as a secretary in the United States is indeed a commercial activity.

I must next consider whether or not this action is "based upon" that commercial activity. The allegations that plaintiff raises concern the terms and conditions of her employment, and raise questions concerning her discharge. The allegations of sexual harassment are therefore necessarily "based upon" the defendants' employment of Zveiter. Thus, defendants are not immune from suit by virtue of the first clause of the commercial activity exception.

### Sexual Discrimination Claims

■ Defendants also contend that the action should be dismissed because plaintiff has not made out a cause of action for either "hostile environment" or "quid pro quo" sexual harassment under the New York Human Rights Law, N.Y. Executive Law § 290 *et seq.*[4] I disagree.

pered if it could be subjected to suit by its employees worldwide. But beyond economies of administration, the very structure of an international organization, which ordinarily consists of an administrative body created by the joint action of several participating nations, requires that the organization remain independent from the intranational policies of its individual members.

4. Plaintiff brings her action pursuant to state, not federal, nondiscrimination law.

Under the New York Human Rights Law, it is an unlawful discriminatory practice "[f]or an employer ... because of the ... sex ... of any individual ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Executive Law § 296(1)(a). This law is virtually identical to its federal counterpart, 42 U.S.C. § 2000e–2 *et seq.*, and consequently the federal standards for actionable sexual harassment are used in determining claims brought under the New York Human Rights Law. *See, e.g., Fair v. Guiding Eyes for the Blind,* 742 F.Supp. 151, 157 (S.D.N.Y.1990); *Nicolo v. Citibank New York State, N.A.,* 147 Misc.2d 111, 554 N.Y.S.2d 795 (N.Y.Sup.1990).

■ Under the parallel federal and state schemes, there are two related types of sexual harassment claims. The first type of claim concerns sexually offensive conduct that creates a pervasive "hostile environment" for employees. The second type, known as "quid pro quo" harassment, occurs when an employer alters an employee's job conditions or withholds an economic benefit because the employee refuses to accede to sexual demands. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986).

■ Hostile environment sexual harassment arises when an employee's "right to work in an environment free from discriminatory intimidation, ridicule, and insult" is violated. *Id.,* 477 U.S. at 65, 106 S.Ct. at 2405. To make out a case of hostile environment sexual harassment, an employee must prove that the conduct complained of "was unwelcome, that the conduct was prompted simply because of the employee's gender, and that the conduct was sufficiently pervasive to create an offensive environment antithetical to the priority of merit—not sex or some other prohibited criterion—in the workplace." *Carrero v. New York City Housing Authority,* 890 F.2d 569, 578 (2d Cir.1989). The only issue raised by defendants' motion is the pervasiveness of the conduct.

Actionable offensive conduct has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive

working environment." *Id.,* 890 F.2d at 577, citing *Vinson.* The employee must prove that the harassment is "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Id.,* citing *Vinson.* The incidents must be "more than episodic; they must be sufficiently continuous and concerted to be deemed pervasive," a determination which must be made from the "totality of the circumstances." 890 F.2d at 577–78.

Taking the facts adduced by plaintiff to be true, as is appropriate on a motion for summary judgment, defendants summarize plaintiff's allegations as follows:

(1) One instance of touching plaintiff's buttocks, immediately withdrawn upon protestation and never repeated;

(2) A suggestion that plaintiff wear apparel which would compliment the physical appearance of her legs and a withdrawn attempt to touch her legs, never repeated, following her protestation;

(3) Three invitations to go out for cocktails, one of which was intended and understood to be in connection with firm-related matters;

(4) Sporadic "little joke[s]," apparently not sexually explicit or even sexually related; and

(5) Plaintiff's alleged discomfort at having her legs looked at.

Defendants contend that these "isolated incidents" cannot, as a matter of law, create a hostile working environment. I disagree.

■ "A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to" remedies for sexual harassment. 890 F.2d at 578. The incidents alleged by Zveiter may have been relatively few, but "[i]t is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts." *Id.* Rather, in analyzing "the totality of the circumstances," the pervasiveness of such actions is also to be determined by reference to "[t]he offensiveness of the individual actions complained of." *Id.* I cannot say that the buttocks-touching, leering, attempted leg-touching, and sundry com-

ments, jokes, and suggestions, do not, as a matter of law, make out a claim for a hostile working environment. This is not to say that all sexually offensive behavior is actionable, nor that a factfinder, evaluating these facts, would be wrong to say that this was not a hostile working environment. All that I conclude is what is required to deny the motion for summary judgment: a factfinder could reasonably find that the abuse to which plaintiff was subjected constituted a hostile working environment, and such a conclusion would not be wrong as a matter of law. The question is one for the factfinder to decide. *Cf. Christoforou v. Ryder Truck Rental, Inc.*, 668 F.Supp. 294, 301 (S.D.N.Y.1987) ("quite sporadic and relatively innocuous" incidents not actionable).[5]

■ Plaintiff also asserts that she may recover under the "quid pro quo" theory of sexual harassment. "The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." 890 F.2d at 579. To prevail on a claim of quid pro quo sexual harassment, a plaintiff must come forward with prima facie proof that she lost a tangible benefit of employment as a result of her refusal to succumb to the alleged sexual demands of an employer. Once a plaintiff satisfies this prima facie burden, the defendant may rebut this inference by articulating some legitimate, non-retaliatory reason for the termination of the employment benefit; the ultimate burden, however, always rests with the plaintiff to prove that the true motive for the loss of the benefit was unlawful quid pro quo harassment. *See St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125

L.Ed.2d 407 (1993); *Tunis v. Corning Glass Works*, 747 F.Supp. 951, 960 (S.D.N.Y.1990), *aff'd*, 930 F.2d 910 (2d Cir.1991).

■ The evidence that Zveiter has brought forward alleging the discriminatory retaliation creates a genuine issue of material fact with regard to the cause for her demotion and ultimate termination. She claims that she was sexually propositioned, physically groped, and verbally harassed, and that she was warned that her failure to "play the game" would jeopardize her employment. Subsequently, she was demoted, and then her employment was terminated. Zveiter has also identified new employees that she believes were hired soon after her termination for purportedly economic reasons, employees that she maintains had inferior job skills.

Although this might be a close call, I conclude that Zveiter has come forward with sufficient factual allegations to withstand a motion for summary judgment on the quid pro quo harassment claims.

### The Release

■ Defendants contend that plaintiff's claims are barred by the terms of a release that she signed following her dismissal. A valid release "which is clear and unambiguous on its face ... even one relinquishing a discrimination claim" will be enforceable "so long as the agreement has been knowingly and voluntarily entered into." *Skluth v. United Merchants & Mfrs., Inc.*, 163 A.D.2d 104, 559 N.Y.S.2d 280, 282 (1 Dept.1990) (valid release waives claims for violations of the New York State Human Rights Law).[6] Plaintiff contends that she

---

5. Curiously, defendants have not raised in their motion papers, and therefore I do not address, whether plaintiff will be able to recover against the named defendants, as opposed to the supervisor alleged to have perpetrated the harassment. "An employer is answerable to a hostile environment claim only if it is established that the employer was aware of or should have been aware of the sexual harassment and failed to take reasonable measures to eliminate the offensive activity." *Tunis v. Corning Glass Works*, 747 F.Supp. 951, 958 (S.D.N.Y.1990), citing *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986).

6. The parties cite numerous cases concerning the unsupervised waiver of rights in suits brought under Title VII and the Age Discrimination in Employment Act ("ADEA"). *See, e.g., Bormann v. AT & T Communications, Inc.*, 875 F.2d 399 (2d Cir.), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989). "Unsupervised" means "a release entered into without the prior approval of a court or the Equal Employment Opportunity Commission," which administers Title VII and the ADEA. 875 F.2d at 401. The case at bar, however, was brought pursuant to the New York Human Rights Law, and therefore the standards applicable to the "unsupervised"

has raised factual questions concerning whether or not her execution of the release was voluntary and knowing. Courts in this district typically examine six factors to determine whether a release is voluntary:

> (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by or consulted with an attorney; and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract law.

*Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1420–21 (S.D.N.Y.1989) (citation omitted).

█ Plaintiff did not negotiate the terms of the release. She was employed as a secretary, and was not an experienced executive familiar with American legal documents. *Cf. Skluth*, 559 N.Y.S.2d at 282 ("The court properly found that plaintiff is an educated, experienced business man with knowledge of release letters such as the one that he was asked to execute.") Defendants did not encourage plaintiff to seek legal advice prior to signing the release, and she did not do so. *Cf. Skluth*, 559 N.Y.S.2d at 282 ("[T]he absence of counsel is far less critical than the opportunity to consult counsel."). Plaintiff only had the release in her possession for a few moments before signing it; indeed, she claims that the only reason that she signed the release was that she was told that she had to sign in order to receive her last paycheck. Defendants contend that plaintiff received some severance pay as consideration for entering into the release, but there is some dispute as to the extent to which this exceeded the pay that she was owed. The release itself is only one paragraph long, and the original was in Portuguese. The claims release language simply states that "I hereby fully, completely and irrevocably release and discharge [Lloyd] from any and all legal obligations, claims or payments of any amount whatsoever." Although it does not expressly

mention sexual harassment or other employment discrimination claims, there is no language that could be construed to restrict the release to claims concerning salary or benefits. *See Skluth*, 559 N.Y.S.2d at 282 (release from "all liability" did not contain limiting categories).

Thus, of the six *Blesedell* factors, only the lack of limiting language in the release and the consideration given in exchange for it could possibly weigh in favor of a finding of voluntariness; by contrast, all four other factors suggest that plaintiff's execution of the release may not have been voluntary and knowing. In light of all of these factors, there are genuine issues of material fact to preclude granting summary judgment against plaintiff on the basis of the release.

### III. *Conclusions*

For the reasons stated above, defendants' motion for summary judgment dismissing the complaint is **DENIED**. Plaintiff is granted leave to file an amended complaint by October 25, 1993, correcting the defective pleading of subject matter jurisdiction and omitting the claims that have previously been withdrawn.

**SO ORDERED.**

---

waiver of rights in the context of the special Title VII and ADEA enforcement schemes that Congress created to eradicate employment discrimination do not apply here. Even if these standards did apply, the result would be the same: denial of the summary judgment motion because of the existence of genuine issues of disputed fact.